FRANK, Judge.
William F. Weber, the appellant, seeks relief from a final judgment entered by the trial court at the conclusion of a non-jury trial denying recovery from the appellee, New Hampshire Insurance Company, of the damages he sustained when his boat sank at its mooring.
In an order entered the same day as the final judgment, the trial court stated its findings:
[T]he Court finds that based on the testimony that had the bilge pump been properly working, no matter what amount of water had entered the boat under any of the possibilities elicited at trial, the pump would have been sufficient to have pumped the water out of the boat and the boat would not have sunk. The Court hereby finds that an improperly working bilge pump does render the vessel unseaworthy under the circumstances of this case.
That portion of the insurance policy with which we are concerned is commonly referred to in the maritime industry as the “Inchmaree” clause. See Winegarner v. South Carolina Insurance Company, 403 So.2d 571, n. 1 (Fla. 2d DCA 1981). It describes the nature and scope of the perils encompassed within the coverage and in the present matter, the Inchmaree provision appears in the policy as follows:
Except as may be excluded elsewhere in this policy the insurance provided by this Section covers against:
(a) All risks of direct physical loss or damage to the described property from any external cause including General Average and Salvage charges when properly incurred (not exceeding however the amount of insurance in Section A, Page 1, of this policy.) •
(b) Physical loss or damage to the described property directly caused by the following:
(1) Explosions, bursting of boilers, breakage of shafts, or any latent defect in the machinery or hull (excluding the cost and expense of replacing or repairing any defective part);
(2) Negligence of master, mariners, engineers or pilots;
provided such loss or damage has not resulted from want of due diligence by the owner of the Yacht or by the Assured.
Exclusions — This insurance does not insure against:
(a) Wear and tear, gradual deterioration, weathering, insects, vermin, mold marine growth, marine borers or unseaworthiness.
The policy at Subsection (b) crystallizes the central question which should have been resolved by the trial court. That is to say, the issue based upon that subsection was not whether the bilge pump rendered the vessel unseaworthy, but rather, whether *674 Weber’s loss “resulted from want of due diligence” on his part or whether the pumping device was undiscoverably, or latently, defective.
It is appropriate to note at the outset of our analysis the substantive principles affecting the disposition of this matter. The owner of a seaworthy vessel need not prove the specific cause of the loss as an element of recovery and in the absence of an ascertainable causation, the loss is presumptively the result of a peril of the sea. Proprietors Insurance Company v. Siegel, 410 So.2d 993 (Fla. 3d DCA 1982). Recovery is properly denied, however, if the vessel is unseaworthy at the time of the loss from a source other than that identified in the Inchmaree clause. Id. Here, as was also the ease in Proprietors Insurance Company, the Inchmaree clause insures against damage or loss occasioned by “any latent defect in the machinery or hull.” If, as the trial court found, the pumping mechanism intended to remove water from the bilge was defective and unable to remove the water which entered and sank Weber’s boat, it was the trial court’s further task to determine if such defect was latent or discoverable by Weber through the exercise of due diligence. The need for the trial court to have undertaken that inquiry is emphatically demanded in the face of its findings, after hearing the several explanations as to the manner in which the water found its way into the boat, that “no matter what amount of water had entered the boat under any of the possibilities elicited at trial, the pump would have been sufficient to have pumped the water out of the boat and the boat would not have sunk.” Thus, if the causation of the bilge pump’s failure was not discoverable, it was a latent infirmity and covered under the Inchmaree clause. On the other hand, if it was discoverable, the question became one of whether Weber fulfilled his obligation to be diligent. It is apparent, however, from the trial court’s conclusion that the vessel simply was not seaworthy because the bilge pump ceased to function that it failed to accord full significance to the Inchmaree clause; thus the trial court placed Weber’s loss within the policy’s exclusion from coverage. The trial court’s endpoint is erroneous; it appears to mimic the question negatively resolved in Tropical Marine Products v. Birmingham Fire Insurance Company of Pennsylvania, 247 F.2d 116 (5th Cir.1957), i.e. does the insuror’s obligation under thé policy terminate pursuant to the excluded coverage clause once an event is demonstrated which, standing alone, is a manifestation of unseaworthiness?
In considering a trial court’s determinations when it acts as the trier of fact, the standard of review we must follow is whether the factual resolutions are supported by competent, substantial evidence. Markham v. Fogg, 458 So.2d 1122, 1126 (Fla.1984). In assessing the competency and substantiality of the evidence, we may not, however, disturb the trial court’s findings unless they are contrary to the manifest weight or are at odds with the legal effect of the evidence. B & B Super Markets, Inc. v. Metz, 260 So.2d 529 (Fla. 2d DCA 1972). In the matter at hand, we need not risk tampering with the trial court’s factual conclusions. Indeed, we adopt them and reverse the trial court by merely carrying the factual analysis, consistent with the Inchmaree clause, an additional step thereby according the evidence its full “legal effect.” The testimony of Stickney, a marine surveyor employed by New Hampshire to evaluate Weber’s boat, reveals that had the bilge pump functioned, the boat would not have sunk. After the boat was raised, Stickney removed the pump and found that it was operational when he attached it to his automobile’s battery. When, however, he tested the float switch intended to activate the pump as water in the bilge rises, he found it inoperative. Stickney further testified that when he examined the wiring associated with the boat’s batteries, he found they had been burned and separated from the batteries. He attributed the condition of the wires to the submersion of the “hot” batteries in salt water resulting in shorting that' in turn caused the wires to melt. *675 Viewing such testimony in its entirety, it becomes inescapable that the primary and sole causation of the pump’s failure was the float switch, the purpose of which is to complete the circuitry essential to the pump’s performance. Based upon the evidence developed before the trial court, it cannot be gainsaid that it was a latent defect within the float switch which caused Weber’s boat to sink. Weber’s practice was to check the pump on a regular basis and in the exercise of due diligence, he found it functioning on the day prior to the day when the boat sank. His claim is within the coverage offered by the In-chmaree clause.
Accordingly, we vacate the final judgment and direct that judgment be entered for the appellant, Weber.
GRIMES, A.C.J., and CAMPBELL, J., concur.